UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



STEPHEN A. PARSON, LEON          )
BENJAMIN, BRUCE L. WALLER SR.    )
                                 )    CIVIL NO. 3:16CV013
V.                               )
                                 )
JAMES B. ALCORN, IN HIS OFFICIAL )
CAPACITY AS CHAIRMAN OF THE
VIRGINIA STATE BOARD OF
ELECTIONS, CLARA BELLE
WHEELER, IN HER OFFICIAL
CAPACITY AS VICE-CHAIR OF THE
VIRGINIA STATE BOARD OF
ELECTIONS; SINGLETON B.
MCALLISTER, IN HER OFFICIAL
CAPACITY AS SECRETARY OF THE
VIRGINIA STATE BOARD OF
ELECTIONS.

## BRIEF IN SUPPORT OF PLAINTIFFS' *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

"Test oaths are notorious tools of tyranny. When used to shackle the mind they are, or at least they should be, unspeakably odious to a free people." *Wieman v. Updegraff*, 344 U.S. 183, 193 (1952) (Black, J., concurring). When used as a condition on voting they are also odious to the law.

The urgency of this matter cannot be overstated. Absentee ballots for the 2016 Virginia Republican Presidential Primary must be made available for both in-person and by-mail use by next week (January 15, 2016). Thus, ballots are probably already being printed. In addition, the State Board of Elections, the entity responsible for running the primary, has its last meeting before the primary on January 8, 2016. Finally, in less than two months, Virginia will hold the Republican Presidential Primary. This Court's immediate action is needed to enjoin the Republican loyalty oath now before it infects the Commonwealth's election.

Under Virginia law, the Republican Party of Virginia ("RPV") has a choice: if they wish to have a closed, Republicans-only nomination process, they can call and a hold a convention, and use a variety of party-funded, party-run processes to ensure only members of the political party participate in the selection process, and nominate who they deem to be sufficiently "Republican." But if they want Virginia taxpayers to fund and administer the primary, then state law requires an open primary, where "each registered voter of the Commonwealth shall be given an opportunity to participate in the presidential primary of the political party." Code of Virginia § 24.2-545. As the Fourth Circuit explained, "a party is free to select from various methods of nomination in which it can exclude voters who do not share its views. . . . It is only when the party chooses to hold a primary operated and funded by the state that it *must allow all voters to participate.*" *Miller v. Brown*, 503 F.3d 360, 368 (4th Cir. 2007) (emphasis added).

Despite the law, and in an effort to keep out certain persons, the RPV is planning, with the state's implementation, to require that every voter sign the following form as a prerequisite to voting in the Republican presidential primary:

| | |
|---|---|
| **Commonwealth of Virginia** | **Republican Presidential Primary**<br>**Tuesday, March 1, 2016** |

**NOTICE TO VOTER**

Section 24.2-545 of the Code of Virginia allows the political party holding a primary to determine requirements for voting in the primary. The Republican Party of Virginia has determined that the following statement shall be a requirement of your participation. Any voter refusing to sign the statement form cannot vote in this Republican Party nominating process.

**STATEMENT**

## My signature below indicates that I am a Republican.

_____       _____
Signature of Voter*                                     Printed Name of Voter*

_____       _____
Email Address                                            Phone

*Required

SBE-545(A)                                                                      REV 12/15

2

Requiring voters to sign this form—a requirement that will apply only to voters who wish to vote for a Republican candidate and that has no analogue in any other Virginia-run election—violates the Voting Rights Act, the Equal Protection Clause, the First Amendment, and state law. A preliminary injunction is therefore necessary to protect voters from this unlawful requirement and preserve the dignity of Virginia's 2016 Republican Presidential Primary. Further, a temporary restraining order enjoining the inclusion of the oath from with absentee ballots is required because without immediate action, chaos will ensue. Ballots are likely already being printed (or will be very soon). And under state law, in-person absentee voting begins next Friday, January 15, 2016. If these oath forms go out the door it will be very difficult for the Court to grant any meaningful relief for those who have received the absentee ballot (with the oath included) and decided not to participate in the primary. Those individuals may not pay any attention to subsequent mailings from the SBE correcting its violation of the law. Thus, this Court must grant a temporary restraining order now to ensure the SBE follows the law and does not infect the primary with this odious oath requirement.

## FACTS

Virginia will hold its Republican Presidential Primary on March 1, 2016. But in-person absentee voting and the mailing of absentee ballots begins on January 15, 2016—in about a week. Presumably, the SBE has already begun printing the many ballots that will be sent. And presumably they are including the form for voters in the Republican primary to sign stating they are "Republican." In addition, the last meeting of the SBE before the primary will be January 8, 2016, in just a few days.

Virginia's political parties do not have to use taxpayer money and Virginia's electoral machinery to select their nominees. But here, that is precisely what the RPV has chosen to do.

3

And with that choice, comes consequences, the most significant is that the party must allow all voters to participate—not just Republicans, but Independents, Libertarians, Greens, Democrats and members of the Tea Party.  Given recent history, it is understandable why the party wishes to erect barriers to full voter participation, and have its cake and eat it too.  A closed party convention (1) costs money, and must be paid for by the party, and (2) tends to elect a candidate more conservative than that preferred by the more establishment Republicans.  An open primary, on the other hand, runs the risk (at least in the eyes of some) that the winner will not be conservative enough.  One answer to this Goldilocks dilemma is to try to rig the system to produce a candidate that is "just right" in the eyes of the party's elders.  Which is precisely what is at issue here: a party-created hybrid, seeking the political "benefits" of a Republican-only affair, excluding the less desirable voters (particularly minorities), yet paid for by the taxpayers of Virginia.  This the party cannot do: once it made the choice to forego a convention and use the taxpayer-funded open primary, the results must be placed in the hands of the voters—all the voters, not just those that the party prefers.

But to keep out the undesirables, the RPV is planning, with the state's cooperation and implementation, to require that every voter sign a loyalty oath as a prerequisite to voting in its presidential primary.  At the behest of the RPV, the SBE will require any voter who wishes to participate in the Virginia-funded Republican primary to sign a pledge that he or she is a Republican—an oath that includes intimidating language invoking the color of state law, yet misstating that same law.  The goal of the oath is clear.  It is to stop anyone who is not a self-described, unequivocal Republican from voting in the primary.  As John Findlay, RPV's Executive Director, put it: "The purpose of the Statement is to build our Party and prevent Democrats from voting in the March 1st Republican Presidential Primary."  Email from John

Findlay to "Unit Chairs" (Dec. 29, 2015 at 4:47 p.m.). But that is precisely what the RPV cannot

do because it has elected to use state money and state infrastructure to fund and run its primary.

And by excluding who the party perceives to be Democrats, minority voters will be

disproportionately excluded.

Neither the RPV nor the SBE have provided much guidance on the oath. They have left

enforcement of the requirement to local election boards and ultimately the volunteers. There are

no instructions on how many forms should be available on election day, nor are their forms in

other languages (except in Fairfax County, where a Spanish-language form will be available).

This lack of guidance will no doubt cause confusion, could lead to inconsistent enforcement that

could negatively be felt most acutely by minority voters, and lead to long lines as voters wait for

volunteers to stumble unguided attempting to enforce the requirement.

Unsurprisingly, voters are dismayed. But even well-established Republicans think it is

wrongheaded. For example, the Goochland County Republican Committee has resolved it

"strongly objects to the use of a statement of a party affiliation in the March 1, 2016 Virginia

Presidential Primary." Resolution, Goochland County Republican Committee (Dec. 30, 2015).

And it has requested that the RPV "reconsider and, as in prior years as recently as 2012,

withdraw their request to the State Board of Elections for use of the statement of party

affiliation." *Ibid.*

In fact, even Republicans who once supported the affiliation statement have since

changed their mind. Former First District Chairman Russ Moulton originally supported the

RPV's decision to require a statement of affiliation prior to voting in the primary. But he now

says, "I have come to believe with deeper understanding [the affiliation statements] are a mistake."[1]

This is not the first time the RPV has tried to force a loyalty oath on voters. In both the 2008 and 2012 primaries, the RPV voted to require a loyalty pledge but scrapped it before the primary took place. The 2012 pledge said: "I, the undersigned, pledge that I intend to support the nominee of the Republican Party for president." *See* Ben Pershing, *Virginia Republicans To Require Loyalty Oath for Primary Voters*, WASHINGTON POST (Dec. 29, 2011). After a lawsuit was threatened, the RPV withdrew the form. *See* Anita Kumar, *Virginia GOP Scraps Plans for Loyalty Oath on Primary Day*, WASHINGTON POST (Jan. 17, 2012). But this new 2016 pledge goes further than the 2012 one because it requires a statement of identity rather than just a statement of action. It is one thing to say one will support a particular candidate; to force voters to agree to an all-encompassing statement of identity is another matter entirely. And like the 2012 oath, this one should be scrapped.

Finally, the fact that this motion comes so close to absentee ballots being mailed and made available for in-person voting (next week, January 15), and regular voting (March 1) is no fault of Plaintiffs. The SBE did not act on the RPV's request to include a test oath until December 16, and the final form differed substantially from the one approved by the RPV. In fact, the actual form approved by the SBE does not appear to have been made public until the morning of the SBE's vote. The RPV's initial vote to ask that a loyalty oath be instituted was not well-publicized (and appears not to have been done in compliance with Republican Party rules regarding public notice), and was not submitted to the SBE for at least two months. And

---

[1] *Moulton: Time To Pull The Plug On The Loyalty Oath*, BEARING DRIFT, available at http://bearingdrift.com/2015/12/30/moulton-time-to-pull-the-plug-on-the-loyalty-oath/ ("*Moulton*").

Plaintiffs, though counsel, encouraged the SBE and the TPV to abandon the oath requirement and avoid litigation.  Moreover, coverage of the test oath has only now reached its crescendo, bringing the unlawful requirement to the fore, and alerting voters.  In any event, as former district chairman Moulton put it, "It's time to pull the plug on this disaster." *Moulton.*

### ARGUMENT

The Supreme Court calls upon a court to use the familiar four factor test for granting a preliminary injunction: (1) Is the plaintiff likely to succeed on the merits? (2) Is the plaintiff likely to suffer irreparable harm in the absence of preliminary relief?  (3) Does the balance of equities tip in plaintiff's favor?  And (4) is an injunction is in the public interest? *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  These factors clearly weigh in Plaintiffs' favor. Plaintiffs also satisfy the requirements of Rule 65, which governs the requirements for a temporary restraining order.  Fed. R. Civ. P. 65.

## I.   PLAINTIFFS WILL LIKELY SUCCEED ON THE MERITS

The "right to vote freely for the candidate of one's choice is the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  At stake here are Virginians' right to vote and Plaintiffs have strong arguments that the oath is unlawful under the Voting Rights Act, unconstitutional under the First and Fourteenth Amendments, and violates Virginia law.

### A.   Virginia's Loyalty Oath Violates the Voting Rights Act.

The loyalty oath constitutes impermissible voter intimidation and an illegal "voting qualification" under the Voting Rights Act ("VRA"). *First,* the requisite form requires an unequivocal, forced statement that is being demanded under color of state law.  The form

7

attempts to intimidate voters who are not Republican into not voting. But that is explicitly

forbidden by § 11(b) of the VRA. 52 U.S.C. § 10307(b).

Voter intimidation has been present throughout the history of the United States. *See*

*Burson v. Freeman*, 504 U.S. 191, 200–07 (1992). It led to the passage of the KKK Act and the

VRA. *See McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) (discussing the KKK Act);

*James v. Humphreys Cnty. Bd. Of Election Commr's*, 384 F.Supp. 114, 118 (N.D. Miss. 1974)

(discussing the VRA). And until the middle part of the last century, Blacks attempting to vote

faced violence and economic reprisal. *United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961).

Though voter intimidation does not usually take such explicit forms today, it remains a perennial

problem. Today minority voters are deterred from voting through subtler attacks (this trend

toward subtler intimidation is similar to that which has occurred in the employment context).

*See* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*,

39 N.Y.U. REV. OF L. & SOC. CHANGE 173, 178 (2015). Contemporary voter intimidation takes

the form of "aggressive poll-watching, anonymous threats of harm, frivolous and excessive voter

registration challenges," *ibid.*, and as this case demonstrates, unnecessarily threatening forms

which contain misstatements of law and fact.

As to the form itself, it contains clear and misleading threats. For example, the form cites

Virginia Code, making it appear like the form is required under penalty of law. It also contains

the ominous threat: "Any voter refusing to sign the statement form cannot vote in this

Republican Party nominating process." Oddly, the form asks for information (email addresses

and phone numbers) that has absolutely nothing to do with the ability to vote—yet in the fine

print, it purports to say such information is not required. Worse, the form overstates and

misstates state law. The form sternly states that state law "allows the political party holding the

8

primary to determine requirements for voting in the primary" without any sort of qualification or limitation. This is false—the party is not holding the primary, the state is holding the primary, paid for by the taxpayers. To the extent the party wishes to hold a closed process, state law most certainly permits that, but the party has chosen a different path. Thus, a required form cannot claim that the party is holding something that is in reality held by the state.

Similarly, state law does not allow the party to determine all requirements to vote, nor could it in such a broad fashion. Although state law does permit the party to choose whether it will have a closed convention or a state-sponsored open primary, and permits to party to ask that voters state that they will support the party's nominee, that is a far cry from what the SBE form is demanding here. The party does not get to decide who is and who is not an acceptable voter among those otherwise rightfully entitled to vote. A loyalty oath that forces a voter to declare himself a Republican without limitation or definition, on the spot, the day of voting while at the polling place is different in kind from the more mundane statements used by the party in the past (for example, asking that a voter confirm that he or she has not voted in another primary election). Here, color of state law is being used to make claims that can only serve to intimidate, and such power cannot be used to intimidate those who are rightfully entitled to vote. This violates the Voting Rights Act. 52 U. S. C. § 10307(b).

*Second*, the oath is an illegal voting qualification. To protect the right to vote, Section 2 of the VRA prohibits any "voting qualification . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U. S. C. § 10301(a). Violations of the VRA can "be proved by showing discriminatory effect alone." *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986). A discriminatory effect is present when

the voting qualification "interacts with social and historical conditions to cause an inequality in the opportunities" for different races to vote for their preferred candidate. *Id.* at 47.

There are two elements to a discriminatory effect claim. *First*, the challenged standard "must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015). *Second*, that burden must "in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Ibid.* The loyalty oath satisfies both of these elements and is therefore illegal.

The oath will inevitably discriminate against African American, Hispanic and similar voters at the polls. The loyalty oath will produce long lines and interminable waits for all voters, but that will hit Blacks and Hispanics especially hard. As one commenter has already noted, the loyalty oath will be "a nightmare to implement." *Oath Required to Vote in Virginia Republican Presidential Primary*, NBC29, (Dec. 16, 2015) (statement of Olga Hernandez, League of Women Voters).[2] Because this requirement is untested and neither the RPV nor the SBE has provided any concrete information regarding the details of how this oath is to be implemented—nor have they given any instructions on how many to print—the oath looks certain to create long lines as poll volunteers and election officials try to enforce the new requirement. Election volunteers have already warned "the [oath] will create long lines." *Ibid.*

---

[2] http://www.nbc29.com/story/30770194/oath-required-to-vote-in-va-republican-presidential-primary.

Long lines are vexing for all voters, but they have a disparate impact on Blacks and Hispanics. Long lines require voters to expend time that they could have spent doing something productive. While wealthy individuals can perhaps afford to wait hours to vote—as some Virginians had to do in the 2012 Presidential election—lower-income individuals working hourly jobs do not have that luxury. *See* Carol Morello and Jeremy Borden, *In Battleground Virginia, Long Waits at the Polls*, WASHINGTON POST (Nov. 6, 2012) (noting voters were waiting up to four hours to cast their ballots).[3] And because minorities make up a disproportionate percentage of lower-income Virginians, these long lines will discourage them from voting at a higher rate than Whites. *See* The Henry J. Kaiser Family Foundation, *Poverty Rate by Race/Ethnicity* (noting in 2013, 6% of Whites were living in poverty as compared to 23% of Blacks and 15% of Hispanics).[4] The harm here is multiplied by the lack of information provided regarding the implementation of this form—apparently, it is being left to local election officials and volunteers to implement. The Voting Rights Act demands much, much more.

Beyond the lines the oath will undoubtedly generate, however, the oath is bureaucratic red tape that will itself likely disproportionately deter minority voters from voting in the Republican Primary. The target of the RPV and the SBE—the undesirables—are voters who have "little experience with public institutions and little time to navigate complex election bureaucracies." Cady, *supra*, at 178. And these individuals are "likely to forgo voting in the face of increased obstacles." *Ibid.* Thus, when a minority voter, unfamiliar with voting—particularly in primaries—arrives to cast a vote and finds an interminable line, a threatening form, a required

---

[3] https://www.washingtonpost.com/local/virginia-politics/in-battleground-virginia-all-eyes-will-be-on-races-for-president-senate/2012/11/05/69eb061a-2770-11e2-b2a0-ae18d6159439_story.html

[4] http://kff.org/other/state-indicator/poverty-rate-by-raceethnicity/

loyalty oath, and confused bureaucrats who cannot answer simple questions because the higher-ups provided no guidance, the minority voter will likely leave the precinct without casting a vote.

The RPV's loyalty oath also imposes the burden of fear and backlash. According to the RPV, after the primary it plans to data mine the signed forms. Personal information such as an email address and phone number are requested, and fine micro-print that such information is not required is no answer (that a government form that is a mandatory prerequisite to voting on election day includes optional information speaks volumes). Not only does that data mining violate voters' privacy; it will disproportionately discourage Black voters from turning out to the primary. Given Virginia's long and unfortunate history of racially polarized voting—discussed further below—if the Republican Party were to release the names of Black voters who had publicly proclaimed that they "are Republicans," those individuals could face backlash from their communities. *See NAACP v. Alabama*, 357 U.S. 449, 462 (1958) ("[O]n past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."). It is unlikely that White voters face a comparable threat of reprisal. Thus, the loyalty oath again disproportionately affects minorities.

The loyalty oath also amounts to a literacy test in disguise. Other than in Fairfax County, the forms will apparently be available in English only. Those who do not speak or read English will be unable to understand the form or know what they are being asked to sign. And on average, a higher percentage of Hispanics (and other minorities) do not speak or read English than White voters. Thus, the burden of the RPV's planned English-only form will fall much more heavily on Hispanic and other minority voters than others—amounting to a declaration that minority voters are unwelcome in the Republican primary. Given that the VRA explicitly aims

to protect citizens "from environments in which the dominant language is other than English," it

is clear that the VRA forbids the RPV's planned loyalty oath. 52 U. S. C. § 10303(f)(1-2).

The burden the loyalty oath would inflict on voters is obviously "linked to social and

historical conditions that have or currently produce discrimination against members of the

protected class." *League of Women Voters*, 769 F.3d at 240. Virginia has a sordid history of

discrimination against Blacks and Hispanics. *See Gingles*, 478 U.S. at 36 (relevant factor under

Section 2 is "the extent of any history of official discrimination in the state or political

subdivision that touched the right of the members of the minority group to register, to vote, or

otherwise to participate in the democratic process"). Even after the 200-year-old practice of

slavery ended in Virginia, the state continued to discriminate against Black citizens. It imposed

a poll tax until 1966 and a literacy test until 1974. *Harper v. Va. State Bd.*, 383 U.S. 663, 666

(1966); *Virginia v. United States*, 386 F. Supp. 1319 (D. D.C. 1974), *aff'd*, 420 U.S. 901 (1975).

During that same period, Virginia forbade miscegenation and fought school desegregation.

*Loving v. Virginia*, 388 U.S. 1 (1967); *Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1356

(4th Cir. 1989).

Virginia likewise has a long, sad history of polarized voting, which is evidence of how

the RPV's planned loyalty oath is linked to historical discrimination. *See Gingles*, 478 U.S. at 36

(holding another relevant factor under section 2 of the VRA is "the extent to which voting in the

elections of the state or political subdivision is racially polarized"). For example, in 1989 the

Fourth Circuit recognized that "the white majority [in Norfolk] normally voted sufficiently as a

bloc to defeat the combined strength of strong minority support plus white crossover votes for

minority preferred candidates who sought a second seat on the [city] council." *Collins v. City of

Norfolk*, 883 F.2d 1232, 1240 (4th Cir. 1989). And in 2012, Mitt Romney won 61% of the White

vote, while Barack Obama won 93% of the Black vote and 64% of the Latino vote, confirming

that the balkanization of voters in Virginia continues today. *See* NBC News, *Virginia*

*Presidential Election Results.*[5]

Minorities continue to feel the effects of discrimination in Virginia even beyond voting.

*See Gingles*, 478 U.S. at 36 (another factor under Section 2 is "the extent to which members of

the minority group in the state or political subdivision bear the effects of discrimination in such

areas as education, employment and health, which hinder their ability to participate effectively in

the political process"). Unemployment rates and poverty rates for Blacks and Hispanics exceed

Whites. *See* U.S. Census Bureau, *2009-2013 American Community Survey 5-Year Estimates*.

Blacks are less likely to have a college education than Whites. *See* Stella Ogunwole, *et al.*, *The*

*Population with a Bachelor's Degree or Higher by Race and Hispanic Origin: 2006–2010*,

American Community Survey Briefs (2012). Hispanics are less likely to own a house. Robert

Callis & Melissa Kresin, *Residential Vacancies and Homeownership in the Third Quarter 2015*,

U.S. Census Bureau News 9 (2015). And these "social and historical conditions" set the

background against which the Republican Party operates and the loyalty oath exacerbates these

ongoing effects and will disproportionately deny Blacks and Hispanics their opportunity to vote

in Virginia's Republican primary. *Gingles*, 478 U.S. at 35.

As a final note, neither the RPV nor the SBE has provided any meaningful explanation as

to how this loyalty oath will be administered. This lack of responsiveness is the one of the

factors that Congress explicitly said is to be considered when applying the Voting Rights Act.

*See* S. Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pp. 28–29. Given the SBE has never

imposed this sort of loyalty oath, and local elections officials have not had to administer such a

---

[5] http://elections.nbcnews.com/ns/politics/2012/virginia/president/#.VncSwRUrKUk

process in recent memory, a vast number of questions remain, and such chaotic uncertainty can easily lead to voters being disenfranchised:

1. Does the form have to be signed before voters are given the ballot, simultaneously with the ballot, or when they submit their ballot?

2. Who will enforce, and who will be permitted to enforce the requirement? Local poll workers? Partisan poll watchers? Campaign poll watchers? Will campaigns be permitted to even have poll watchers related to this subject at the polling place?

3. What recourse does someone have who is not allowed to vote because he or she refuses to sign the Party's form in addition to the voter rolls?

4. How will it be ensured that the requirement is enforced consistently across precincts, polling places, counties, and across the state? How many of the forms will be provided to each polling location?

5. What is the procedure for voting if a polling location runs out of forms? Must no more Republican ballots be cast?

6. How will absentee voters be provided the form?

7. What is the official response a poll worker should give if a Democratic poll watcher suggests that the Democratic primary is open, but the Republican primary is closed? How will this response be distributed to the polling locations?

8. In light of the RPV's desire to use its loyalty oath as a way to build a list and acquire data, what is the response to those who have privacy concerns about the statement? Is this Statement a duplicative effort since anyone signing the petition to place a candidate on the Republican ballot has the intent to vote in the Republican primary and the Republican primary vote records establish a de-facto party membership list?

9. Will the completed statements be compared to the voter rolls? If so, who will be doing the data entry and audit – comparing the Statements to the actual voter records? What will happen if the audit shows that people were allowed to vote without submitting the Statement of Party Affiliation? Will those people be prosecuted for illegally casting votes? Will the government poll workers be accused of allowing vote fraud? Will the party issue challenges to the poll workers so that they cannot work future elections? Will the Party seek to invalidate the primary results if one or more precincts collect no statements, but do allow voters to cast Republican primary ballots?

Contrary to what is happening in Virginia, the Republican National Committee has sought to increase the number of citizens who wish to support Republican candidates. As the

Republican National Committee's recent Growth and Opportunity Project indicated, identifying, encouraging, and securing new Republican voters is key to the Party's development and success—particularly when it comes to minorities, young voters, crossover voters, and other individuals who may not necessarily be ready or willing to publicly proclaim they are "Republican." Specifically, the RNC's report stated: *"The Republican Party must focus its efforts to earn new supporters and voters* in the following demographic communities: Hispanic, Asian and Pacific Islanders, African Americans, Indian Americans, Native Americans, women, and youth;" and "we also need to make a concentrated and serious effort to go after new voters and that means targeting and converting lower propensity votes in the urban core and city centers." Republican National Committee, Growth and Opportunity Project 12 (2012) (emphasis added). These statements render the RPV's latest loyalty oath counterproductive. And they certainly eviscerate any sort of non-exclusionary, non-discriminatory purpose that may be proffered by the RPV in support of its actions.

Because the RPV has opted to have Virginia pay for and administer its presidential primary, it "must allow all voters to participate." *Miller*, 503 F.3d at 368. The VRA confirms as much by forbidding any voting qualification that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." § 10301(a). But the RPV has blown past that prohibition by forcing every primary voter to announce that he or she is unequivocally a "Republican"—as discussed further below, it is not at all clear what this means. That demand—made by a local election official under color of state law per the order of the SBE—is illegal.

**B.   Virginia's Loyalty Oath Violates the Equal Protection Clause.**

"[T]he power of the states to determine the manner of holding elections is limited by the Equal Protection Clause of the Fourteenth Amendment." *Socialist Workers Party v. Hechler*,

890 F.2d 1303, 1309 (4th Cir. 1989), *superseded by statute on other grounds*. This planned loyalty oath violates that Clause in three ways.

*First*, this requirement will disenfranchise the countless voters—like Plaintiffs—who wish to vote for a candidate for President on the Republican ticket but who are unwilling to publicly declare that they are "Republicans." As discussed further below, it is not clear what declaring oneself to be a "Republican" means—Virginia does not have party registration—but it certainly suggests that the person is committing to support every Republican candidate for every office on the ballot in November, the entire Republican Party platform, and all things Republican. "[B]ecause most people want to keep their vote secret, many potential subscribers will be reluctant to openly declare their voting preference in a nominating certificate." *Id.* at 1310.

*Second*, this requirement will disenfranchise every voter who is comfortable with having public records reflect their vote in the Republican presidential primary, but who otherwise believes the secret ballot is important. By declaring their loyalty to the Republican Party, voters are, again, publicly proclaiming their allegiance to a particular political party and all that entails. Requiring that strong political statement is a constitutionally unacceptable price for participating in democracy, particularly when state law (1) allows the party to have a Republican-only nominating convention, and absent that, requires (2) a taxpayer-funded open primary that "must allow all voters to participate." *Miller*, 503 F.3d at 368.

Plenty of people can and do support Republicans without wanting to tell the world that they are Republicans: "[S]ome individuals who have made up their minds, and who would ordinarily have no objection to stating their preferences, might be put off by the possible reaction to associating themselves with the more unpopular political groups." *Socialist Workers Party*,

890 F.2d at 1310. Given the Republican Party's 32% approval rating,[6] this category of voters—those who support a Republican candidate but who do not wish to tell the world they "are Republicans"—is likely quite high. *See also, e.g., Libertarian Party of Nebraska v. Beermann*, 598 F. Supp. 57, 63 (D. Neb. 1984) ("[M]any voters have no desire to change basic political affiliations, but neither do they vote a straight political ticket in the general elections.").

*Third*, it is only those voters who seek to support a Republican candidate that "must declare" their loyalty to a "specific" political party. *Socialist Workers Party*, 890 F.2d at 1310 (quoting *Anderson v. Mills*, 664 F.2d 600, 609 (6th Cir. 1981)). "Electors who support other candidates have to make no such public declaration" and "[t]he chilling effect that such a practice has on associational and voting rights is obvious." *Ibid.* (quoting *Anderson*, 664 F.2d at 609). Those citizens who wish to vote for a Republican candidate for President—and only those citizens—"must decide whether to sign" the Virginia-mandated form, thus "having" their "political preference clearly and unmistakably disclosed," or to "refrain from signing" and thus forfeit the chance to vote. *Ibid.* (quoting *Anderson*, 664 F.2d at 609). That will uniquely deter citizens from participating in the Republican primary, which is the only state-funded election in Virginia that requires pledging fealty to a political party as the price of participation.

Against all this, there is no state interest that is compelling enough to justify turning away voters who want to participate in the political process without pledging allegiance to a political party. Foremost, Virginia's planned loyalty oath is not necessary to protect "the integrity of the nominating process" by "confin[ing] voters to supporting one party and its candidates in the course of the same nominating process." *American Party of Texas v. White*, 415 U.S. 767, 786

---

[6] Republican Party Favorability, Pew Research Center (July 20, 2015), available at http://www.pewresearch.org/data-trend/political-attitudes/republican-party-favorability/.

(1974). *That* goal could be accomplished with a simple statement affirming that the voter has no intention of participating in any other party's primary election that year. That simple confirmation would fully protect the legitimate interest in limiting each voter's participation to a single primary election without disenfranchising the many voters who are unwilling to sign public declarations of unfettered loyalty to the Republican Party. And that simple statement is, of course, precisely what RPV has used in the past.

Beyond that, the SBE's "interest in making voters disclose their voting preferences is neither legitimate nor strong, and in fact serves no purpose whatever, except to have a chilling effect on the voter." *Socialist Workers Party*, 890 F.2d at 1309. Just as the SBE could not adopt a rule that explicitly excluded African American voters from participating in its primary, *see Smith v. Allwright*, 321 U.S. 649 (1944), or create a pre-primary by another name that is intended to exclude minority voters, *Terry v. Adams*, 345 U.S. 461 (1953), it cannot adopt a policy that has the sole purpose of deterring registered voters from exercising their constitutional right to vote because it causes "a violation of the potential [voters'] First and Fourteenth Amendment rights." *Socialist Workers Party*, 890 F.2d at 1310.

### C. Virginia's Loyalty Oath Violates the First Amendment.

In addition to violating the Equal Protection Clause, Virginia's planned loyalty-oath requirement violates the First Amendment and the Fourteenth Amendment more generally. The First Amendment forbids conditioning a citizen's right to vote in the state-funded, state-administered election for the Republican candidate for President on a declaration that he or she is a "Republican." Virginia's planned "loyalty oath" is far more invasive and burdensome on First Amendment freedoms than merely requiring party registration as a condition of participating in a party primary. Registering to vote as a Republican is ministerial, unexplained affiliation with the party for purposes in voting in primary elections; it is no more burdensome or invasive than

simply casting a primary vote itself. *See, e.g., Clingman v. Beaver*, 544 U.S. 581, 590 (2005) ("In general, anyone can 'join' a political party merely by asking for the appropriate ballot at the appropriate time or (at most) by registering within a state-defined reasonable period of time before an election." (quotation omitted)). Virginia's requirement is much more than that. It requires every participant in the Republican Primary to sign the oath, after arriving at the polling place, and as a precondition to vote in what has otherwise been described as an open primary, which is then made available for all the world to see.

It is difficult to imagine a more politically charged statement than publicly proclaiming oneself to be "a Republican." Rather than requiring voters to affirm that they are voting only in the Republican Primary or that they are (for now) supporting Republican candidates, Virginia's loyalty oath would require voters to self-identify as "Republicans"—a self-categorization that brings with it over 150 years of history and policy positions. Even voters who generally support Republican candidates and who generally vote in Republican primaries might be uncomfortable telling the world that they *are Republicans*, as opposed to free-thinkers who *often support* Republicans. And that burden is even heavier, of course, for voters who are not historically Republicans but who wish to take advantage of the "opportunity to participate in the presidential primary of the political party," Code of Virginia § 24.2-545, to vote for their candidate of choice.

The Supreme Court long ago explained, "The right to vote can neither be denied outright, *Guinn v. United States*, 238 U.S. 347, *Lane v. Wilson*, 307 U.S. 268, nor destroyed by alteration of ballots, *see United States v. Classic*, 313 U.S. 299, 315, nor diluted by ballot box stuffing, *Ex parte Siebold*, 100 U.S. 371, *United States v. Saylor*, 322 U.S. 385." *Reynolds*, 377 U.S. at 555. Nor can it be made contingent on public declarations identifying oneself as a total partisan and all that entails on election day while in the polling place, for the first, time, as a precondition to

voting in what is supposed to be an open primary—such identification that, again, goes beyond mere membership or affiliation.

"[F]reedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. FAIR*, 547 U.S. 47, 61 (2006) (citing *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943), and *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)). And by "telling" Plaintiffs what they "must say" in order to cast a ballot for the candidate of their choice in the state-funded Republican Presidential Primary, Virginia has violated their First Amendment right to espouse only the political messages they choose. They are being forced to adopt all aspects of being "Republican"—the good, the bad, and in their eyes, the ugly.

This would, indeed, be true even if Plaintiffs did not have a right to vote in the Republican Primary. It is well-established that governments "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *FAIR*, 547 U.S. at 59; *see also, e.g., Keyishian v. Bd. of Regents of the Univ. of N.Y.*, 385 U.S. 589, 606 (1967) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." (quotation omitted)). Having chosen "to hold a primary operated and funded by the state," the RPV cannot make allowing "voters to participate," *Miller*, 503 F.3d at 368, contingent on those voters surrendering their First Amendment right to refrain from proclaiming themselves to be Republicans. Governments cannot "force citizens to confess by word or act their faith" in a particular political party, *Barnette*, 319 U.S. at 642, and they cannot impose that requirement as the cost of accepting the "benefit" of voting for the candidate of one's choice in a state-funded primary election.

This is particularly true here, where the demanded oath extends far beyond the narrow issue of which candidate should serve as the Republican candidate for President. In the analogous context of conditioning federal funding on speech restrictions, the Supreme Court has consistently invalidated restrictions that "reach outside" the funding to restrict unrelated speech. *Agency for Intern. Development v. Alliance for Open Society Intern., Inc.*, 133 S. Ct. 2321, 2330 (2013). Here, Virginia's requirement forces every person who wishes to cast a vote for the Republican candidate *for President* to *both* pledge loyalty to this year's eclectic slate of Republican presidential candidates *and* pledge his or her loyalty to the *entire Republican Party* without reservation or limitation, its platform and its reputation and history. Each voter must tell the world that "I am a Republican" without any qualification, limitation, or tailoring to the specific primary election at issue. Requiring every voter to make that extraordinarily broad statement far outstrips Virginia's and the RPV's narrow interest in limiting the Republican Primary to voters who actually support one of the Republican candidates and who are not voting in other parties' primaries. It thus violates the First Amendment, as well as the Fourteenth.

### D. Virginia's Loyalty Oath Violates State Law.

In promulgating the oath form, the SBE violated Virginia law. Virginia law empowers political parties to establish "requirements" to participate in primaries, but those requirements must be "approved by the State Board." Code of Virginia § 24.2-545. And while the requirements can include "the signing of a pledge by the voter of his intention to support the party's candidate," the requirements must be "determined at least 90 days prior to the primary date and certified to, and approved by, the State Board." *Ibid.*

But here, the SBE violated that law in three ways. *First*, it did not approve the oath requirement submitted by the RPV. Instead it wrote its own, more intimidating form. *Second*,

the SBE's "approval" came two weeks after the 90-day deadline. *Third*, the SBE created a party-loyalty oath that differs and is distinguishable from the one oath permitted by statute.

*First*, the SBE did not approve the form submitted by the RPV. Section 24.2-545 provides: "The requirements applicable to a party's primary shall be determined at least 90 days prior to the primary date and certified to, and approved by, the State Board." *Ibid.* In other words, the *party* must *propose* the requirements and the *SBE* must *approve* the requirements. The SBE cannot create its own political requirements for participation in the primary. But that is precisely what the SBE did here.

The RPV certified the following form to the SBE:



### Statement of Republican Party Affiliation

Virginia does not register voters by political party. Virginia law allows a political party to ask that voters in its Presidential Primary affiliate with that party.

My signature below indicates that I am a Republican.

Printed Name*                    Signature*

Email Address                    Phone

*Required

Property of the Republican Party of Virginia

23

But that is not what the SBE "approved." Instead, the resulting form is more intimidating in its language and also contains errors:

Commonwealth of Virginia                                          Republican Presidential Primary
                                                                         Tuesday, March 1, 2016

NOTICE TO VOTER

Section 24.2-545 of the Code of Virginia allows the political party holding a primary to determine requirements for voting in the primary. The Republican Party of Virginia has determined that the following statement shall be a requirement of your participation. Any voter refusing to sign the statement form cannot vote in this Republican Party nominating process.

STATEMENT

## My signature below indicates that I am a Republican.

_____                    _____
Signature of Voter*                                                   Printed Name of Voter*

_____                    _____
Email Address                                                         Phone

*Required

SBE-545(A)                                                              REV 12/15

For example, the new form cites the Virginia Code, making it appear like the form is required under penalty of law. Similarly, the color of state law is further emphasized by the inclusion of "NOTICE TO VOTER"— capitalized throughout and underlined for effect. The form also contains the threat that "[a]ny voter refusing to sign the statement form cannot vote in this Republican Party nominating process." That statement was not present in the form developed by the RPV. The form also misstates fact and law when it says state law "allows the political party holding the primary to determine requirements for voting in the primary." This representation is patently false. The RPV is not administering the primary, the state is. And state law does not allow the party to determine all requirements to vote, nor could it in such a broad fashion. In any event, Virginia law only allows the SBE to "approv[e]" requirements submitted by the political parties. § 24.2-545. It does not permit the SBE to make up its own

24

politically-based requirements for voter participation.  And because the SBE did not "approve" the form submitted by the RPV, but instead drafted its own, it has acted *ultra vires* and its action should be set aside.

Second, the SBE did not comply with the 90-day requirement in creating the oath form. The SBE must "approv[e]" any requirements "at least 90 days prior to the primary date." *Ibid.* But the SBE "approved" its form on December 16, a mere 76 days before the primary, in clear violation of the 90-day rule.  The fact that the RPV certified a different form two months prior is irrelevant.  The SBE did not approve that form, thus, the RPV's certification of the earlier form cannot serve as the triggering date for the 90-day rule.  Moreover, the statute is directed at the SBE, not the political party, because the SBE is the only one who can "approv[e]" the "requirements." *Ibid.* The clear import of the statute is that the Board must approve the requirements the party proposes 90 days before the primary is to be held.  Any other interpretation would allow the SBE to approve requirements on the day of (or perhaps even after) a primary.

Third, Virginia law authorizes political parties to require only one pledge, a pledge to support "the party's candidate."  § 24.2-545(A).  By authorizing a candidate-support pledge, the statute's clear implication is that other "pledges"—like the one at issue here—are not authorized. *See Leatherman v. Tarrant Cnty. Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (*"Expressio unius est exclusion alterius."*).  The statute does suggest the requirement listed is merely "illustrative rather than exhaustive," *Samantar v. Yousuf*, 130 S. Ct. 2278, 2287 (2010), because the requirement follows the phrase "[t]he requirements may include," Code of Virginia § 24.2-545(A).  Nonetheless, even if the requirement is "merely illustrative, it still suggests that" no other pledge would be required because the statute provides no illustration of requiring a

statement of *party* support. *Samantar*, 130 S. Ct. at 2287; *see also Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) ("[A] word may be known by the company it keeps.").

Not only does this interpretation comport with the text, it is compelled by the canon of constitutional avoidance. The Court must construe the Virginia statute to not permit the loyalty oath at issue here to avoid serious constitutional concerns. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). As discussed above, the loyalty oath violates the First and Fourteenth Amendments to the Constitution. *See supra* I.B and I.C. And when the constitutionality of a statute is challenged and the statute can be reasonably interpreted in two ways, a court must adopt the interpretation that saves the statute from unconstitutionality. *Skilling v. United States*, 561 U.S. 358, 406 (2010). This canon of constitutional avoidance does not require an actual violation, it requires only serious constitutional doubt. *See Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). Given the serious constitutional questions raised by interpreting § 24.2-545 to allow the SBE to promulgate the test oath at issue, the Court must construe the statute to not permit the oath promulgated by the SBE.

## II.  EQUITABLE FACTORS

The remaining factors for a preliminary injunction all weigh in Plaintiffs' favor.

*First*, Plaintiffs will suffer irreparable harm absent an injunction. When "constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). As has already been shown, the loyalty oath amounts to an unlawful restriction on the right to vote. Since a "restriction on the fundamental right to vote . . . constitutes irreparable injury," *ibid.*, this factor weighs heavily in favor of granting the injunction. *See also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (finding that the denial of the right to vote is "irreparable harm"). Moreover, given that absentee ballots are set to

26

be mailed on January 15, 2016, the Court must act now to avoid the cost and confusion that will result from the SBE's actions.  If voters receive an oath form with their absentee ballot, they may immediately decide not to vote in the primary.  Any subsequent mailings from the SBE to "correct" the issue would likely be ignored.  In other words, once the horse is out of the barn, the Court will have little power to corral it.  In all events, time is of the essence because absentee voters need to know whether they can vote and whether they will be forced to sign the loyalty pledge.

*Second*, no interested party will suffer harm from an injunction.  In fact, the Commonwealth will save money.  If the printing of the oath forms can be enjoined in time, tax-payers' money will not be wasted.  The SBE will no doubt argue that it is merely effectuating the will of the RPV, who in turn will argue it wants to protect the integrity of the primary by ensuring only Republicans vote.  If the party was so concerned about Republican imposters, it should have opted to run its own primary or convention, not one funded by the taxpayers.  Moreover, it is not even clear the oath will keep out political pretenders.  If Democrats are dead set on infiltrating with the Republican Primary, it is unlikely a loyalty oath will deter them.  Indeed, it may become a badge of honor.

*Third*, the public interest is in Plaintiffs' favor.  The public has an interest in election day (and absentee voting) running smoothly without the threat of chaos at the polls, long lines, and potentially multiple ballots being sent to absentee voters.  While it is true that states have "a strong interest in their ability to enforce state election law requirements," *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011), they have no interest in enforcing an unconstitutional rule.  Moreover, the public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4, (2006) (quoting *Dunn v. Blumstein*,

405 U.S. 330, 336 (1972)). "That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Hunter*, 635 F.3d at 244. Finally, the fact that absentee ballots are scheduled to go out imminently magnifies the public interest; and this issue must be resolved immediately.

## III.  NO NOTICE IS REQUIRED

Under Rule 65 a temporary restraining order may issue without notice to a party if two conditions are met. First, there are "specific facts in an affidavit or a verified complaint" that show immediate irreparable injury will occur before the defendant can be heard. Fed. R. Civ. P. 65(b). Second, "movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *Ibid.*

As to the first requirement, the verified complaint details the specific facts that show how the SBE's actions will cause immediate injury. Absentee ballots and the oath form are either already being printed or will be shortly, and then sent and made available to voters next week. If the oath form is included in those mailings, disenfranchisement will have begun. It will be very difficult to unscramble the egg.

As to the second requirement, the undersigned certifies that he has notified the SBE of this lawsuit and sent a copy of the relevant filings to its agent. Moreover, the undersigned sent a letter to both the SBE and RPV more than twenty-four hours before filing this lawsuit asking them to change course.

Finally, there is no merit to any suggestion that Plaintiffs delayed in filing this lawsuit. Any delay is the fault of the SBE and the RPV. First, the RPV did not properly notice its proposed oath requirement. Rule 16 of the Republican National Committee requires the RPV to publish any requirements to participate in a primary "in at least one (1) newspaper having a

28

general circulation throughout the state . . . at least ninety (90) days before such qualificatio[n] become[s] effective." RNC Rule 16(d)(2). To this date, the RPV has yet to publish its oath requirement in accordance with this rule. Not only does this failure raise the possibility of a credentials challenge to Virginia's delegates at the national convention, it also results in the public being largely unaware of this oath requirement. As to the SBE's fault, it waited until the last possible minute (right before the holidays) to issue its new oath form, and even then, did not make the ultimate form under consideration publicly available until the day of its vote. And this matter is only now coming to the public's attention. In sum, Plaintiffs bare no responsibility for the timing of this motion.

## CONCLUSION

For all the above reasons, the loyalty oath is illegal on at least four different bases and should be enjoined. But not only is the RPV and SBE's transparent attempt to discriminate against poor and minority voters illegal, it is also un-Virginian. As James Madison—one of the greatest Virginians to ever live—wrote: "Who are to be the electors of the Federal Representatives? Not the rich more than the poor; not the learned more than the ignorant; not the haughty heirs of distinguished names, more than the humble sons of obscure and unpropitious fortune. The electors are to be the great body of the people of the United States." THE FEDERALIST, No. 57 (Cooke ed. 1961), at 385. James Madison was correct.

This matter is urgent. And this Court should not hesitate in granting Plaintiffs' motion for a temporary restraining order to stop the inclusion of the oath form in absentee ballots being mailed or made available next week. Further, this Court should grant Plaintiffs' motion for a preliminary injunction and prevent the SBE from requiring any voter to sign the oath form as a condition of voting in the Republican Presidential Primary.

Dated: January 6, 2016

Respectfully submitted,

_/s/ Chester Smith_
Chester Smith
Smith Law Group, PLLC
293 Independence Boulevard, Suite 231
Virginia Beach, VA 23462
Phone: (757) 490-3181
Email: chucsmit@live.com