**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**STEPHEN A. PARSON, SR.,**
**LEON BENJAMIN,**
**and BRUCE L. WALLER, SR.,**

      **Plaintiffs,**

**v.**                                                                   **Civil Action No. 3:16cv13**

**JAMES B. ALCORN, in his official capacity**
**as Chairman of the Virginia State Board of**
**Elections; CLARA BELLE WHEELER, in**
**her official capacity as Vice-Chair of the**
**Virginia State Board of Elections;**
**SINGLETON B. MCALLISTER, in her**
**official capacity as Secretary of the Virginia**
**State Board of Elections;**
**and,**
**THE REPUBLICAN PARTY OF VIRGINIA,**

      **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs Stephen A. Parson, Sr., Leon Benjamin, and Bruce L. Waller, Sr.'s Motion for Preliminary Injunction. (ECF No. 3.) On January 11, 2016, Defendants James B. Alcorn, Clara Belle Wheeler, and Singleton McAllister, in their official capacities as officers of the Virginia State Board of Elections, responded. (ECF No. 14.) On January 12, 2016, Plaintiffs replied. (ECF No. 16.) On January 13, 2016, the Court heard oral argument. Accordingly, the matter is ripe for disposition. This Memorandum Opinion expounds upon the ruling as set forth in the January 14, 2016 Order. (ECF No. 24.)

# I. Factual and Procedural Background[1]

A. **Factual History**

1. **Virginia Primary Election Administration**

To set the stage for the present action, the Court provides an overview of the various avenues political parties can use to select a presidential nominee. The Court then turns to the system established in Virginia.

In Virginia, as in states across the country, political parties have the power to "provide for the nomination of . . . candidates" for elected office. Va. Code § 24.2-508. Parties have many options by which they effectuate such nomination, especially, and related to this case, for candidates for the presidency of the United States. Va. Code § 24.2-545(A) ("The duly constituted authorities of the state political party shall have the right to determine the method by which the state party will select its delegates to the national convention to choose the party's nominees for President and Vice President of the United States including a presidential primary or another method determined by the party."). Options "include (but are not limited to) a party convention; a mass meeting, also known as a 'caucus'; and a party canvass or unassembled caucus, also known as a 'firehouse primary.'" *Miller v. Brown*, 503 F.3d 360, 362 (4th Cir. 2007) (citations and footnote omitted).

An additional method of nomination, commonly used and at issue in this case, is a primary. Three principal types of primaries exist: closed,[2] semiclosed,[3] and open.[4] By statute,

---

[1] "The facts reproduced here are merely *preliminary facts* and do not represent factual findings for any purpose other than the resolution of the instant motion." *Pro-Concepts LLC v. Resh*, No. 2:12cv573, 2013 WL 5741542, at *1 n.1 (E.D. Va. Oct 22, 2013).

[2] In a closed partisan primary, "only persons who are members of the political party—*i.e.*, who have declared affiliation with that party when they register to vote—can vote on its nominee." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 570 (2000) (citation omitted).

Virginia usually holds entirely open primaries. This is unlike most states, which require party identification in some form of closed primary.[5] In most Virginia elections, "[a]ll persons qualified to vote . . . may vote at the primary. No person shall vote for the candidates of more than one party." Va. Code § 24.2-530.

If the party chooses to proceed by primary, the Commonwealth funds the primary and the SBE administers it. *Miller*, 503 F.3d at 362. When the SBE manages a primary election, the Code of Virginia tasks the SBE with broad discretion to "supervise and coordinate [local electoral boards and registrars] to obtain uniformity in their practices and proceedings and legality and purity in all elections" and to "make rules and regulations . . . to promote the proper administration of election laws." Va. Code § 24.2-103(A). Political parties, however, retain considerable input in the primary process. In a presidential primary, subject to the statutory mandate that "each registered voter of the Commonwealth shall be given an opportunity to participate in the presidential primary of the political party," the Code allows the party to "set requirements . . . for participation in its presidential primary." Va. Code § 24.2-545(A). Such

---

[3] A party holding a semiclosed primary "invite[s] only its own party members and voters registered as Independents to vote in the party's primary." *Clingman v. Beaver*, 544 U.S. 581, 584 (2005).

[4] "The major characteristic of open primaries is that any registered voter can vote in the primary of either party." *Democratic Party of the U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 111 n.4 (1981) (citation omitted).
In 2000, the Supreme Court of the United States found unconstitutional California's use of another primary system known as a blanket primary system. *Jones*, 530 U.S. at 577. In a blanket primary, "each voter's primary ballot . . . lists every candidate regardless of party affiliation and allows the voter to choose freely among them." *Jones*, 530 U.S. at 570. Then, "the candidate of each party who wins the greatest number of votes" becomes the nominee of that party." *Id.*

[5] *See Miss. State Democratic Party v. Barbour*, 491 F. Supp. 2d 641, 652–53 (N.D. Miss. 2007) (noting that the "majority of states" hold closed primaries and characterizing Virginia's system as a "facially open" primary), *rev'd on other grounds*, 529 F.3d 538 (5th Cir. 2008).

requirements must "be determined at least 90 days prior to the primary date and certified to, and approved by, the [SBE]." Va. Code 24.2-545(A). Additional deadlines impact the primary. For example, under the Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20302(a)(8),[6] the Commonwealth must send absentee ballots to overseas citizens, including military personnel, not later than 45 days prior to an election.[7]

### 2.    2016 Republican Presidential Primary

On November 24, 2015, the RPV filed with the SBE its proposed requirements for the 2016 presidential primary. (Defs.' Resp. 2, ECF No. 14.) Among other proposals, the RPV sought to enclose a document with each ballot stating the following:

> **Statement of Republican Party Affiliation**
>
> Virginia does not register voters by political party. Virginia law allows a political party to ask that voters in its Presidential Primary affiliate with that party.
>
> My signature below indicates that I am a Republican.

(Verified Compl. 23; Jan. 13, 2016 Hr'g Defs.' Ex. 1.) Blank lines for a signature and printed name follow the proposed language. (*Id.*) An asterisk indicates that these lines are required. (*Id.*) Lines for email address and phone number are included, but because they lack an asterisk, responses do not appear to be required.

---

[6] 52 U.S.C. § 20302(a)(8) provides, in pertinent part: "Each State shall-- . . . **(8)** transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter-- **(A)** [exceptions not relevant here], in the case in which the request is received at least 45 days before an election for Federal office, not later than 45 days before the election . . . ." 52 U.S.C. § 20302(a)(8).

[7] Given the statutory deadline and the January 15, 2016 state holiday, most absentee ballots had to be mailed by Thursday, January 14, 2016.

On December 16, 2015, the SBE held a meeting during which it considered a version of

the RPV proposal as transcribed onto a state form by state personnel.  Agency personnel added

language to the form and cited Section 24.2-545(A).  Virginia Commissioner of Elections

Edgardo Cortés testified in this Court that agency personnel added a notice that "[a]ny voter

refusing to sign the statement form cannot vote in this Republican Party nominating process" in

order to keep the form consistent with earlier forms created by the SBE.[8]  The proposed form,

entered as Defendants' Exhibit 2, stated:

Commonwealth of Virginia
                  Republican Presidential Primary
                      Tuesday, March 1, 2016

NOTICE TO VOTER

Section 24.2–545 of the Code of Virginia allows the political party holding a primary to determine requirements for voting in the primary.  The [RPV] has determined that the following pledge shall be a requirement of your participation.  Any voter refusing to sign the statement form cannot vote in this Republican Party nominating process.

STATEMENT

My signature below indicates that I am a Republican.

| | | |
|---|---|---|
| _____ | | _____ |
| Signature of Voter* | | Printed Name of Voter* |
| _____ | | _____ |
| Email Address | | Phone |
| *Required | | |

(Jan. 13, 2016 Hr'g Defs.' Ex. 2.)

After a representative of the RPV commented during the December 16 SBE meeting that

the voter document language was a statement and not a pledge, the SBE unanimously approved

an amended form that replaced the word "pledge" with "statement."  (Jan. 13, 2016 Hr'g Defs.'

---

[8] It is not clear from this limited record when, or if, those template forms were used during a Virginia election.

Ex. 3.)  The SBE approved a final version of the voter document language (the "Statement").[9]

The final statement, first publically released on December 16, reads as follows:

Commonwealth of Virginia                                        Republican Presidential Primary
                                                                      Tuesday, March 1, 2016

NOTICE TO VOTER

Section 24.2-545 of the Code of Virginia allows the political party holding a primary to determine requirements
for voting in the primary.  The [RPV] has determined that the following statement shall be a requirement of your
participation.  Any voter refusing to sign the statement form cannot vote in this Republican Party nominating
process.[10]

STATEMENT

My signature below indicates that I am a Republican.

_____          _____
Signature of Voter*                                 Printed Name of Voter*

_____          _____
Email Address                                       Phone

*Required

(Jan. 13, 2016 Hr'g Defs.' Ex. 4.)

Concomitant to approving the form, the SBE sent by email on December 15 a list of

Frequently Asked Questions ("FAQs") to general registrars and local electoral board members as

"guidance . . . which addres[ses] question from general registrars regarding the process of

---

[9] SBE characterizes this as a "statement" throughout briefing and did the same at oral argument.  Contemporaneous SBE records, on the other hand, call these documents an "oath" or "pledge."  For ease of reference, this Court will characterize them as "voter documents" or "statements."

[10] During this Court's hearing on the Preliminary Injunction, evidence emerged that Statement included with the absentee ballots had slightly different language on it.  The sentence warning voters who refuse to sign that they "cannot vote" has been removed.  Instead, the absentee ballot enclosures include instructions on returning the Statement with the ballot.  The absentee ballot Statement notifies voters that the "statement shall be a requirement of [the voter's] participation" and seeks a signature to "ensure" that the ballot "can be counted." (Jan. 13, 2016 Hr'g Defs.' Ex. 3.)

utilizing the voter statement." (Cortés Decl. ¶ 6, ECF No. 14-3; *id.* Ex. A-1.) Those FAQs

included the following:

> 1. If someone refused to sign [sic] *oath*, can they still vote?
>
>> No. [quoting Va. Code § 24.2-545(A) in full]
>
> . . .
>
> 5. Do we need to mail the *pledge* with the absentee voters . . . ?
>
>> "The *oaths* must be mailed along with Absentee Ballots . . . .
>
> . . .
>
> 15. Can a voter submit a provisional vote without signing the *oath*?
>
>> No. Any voter refusing to sign the *pledge* cannot vote in this Republican
>> Party nominating process. Refusal to sign the *oath* is not a basis for
>> issuing a provisional ballot since there is no eligibility issue that can be
>> remedied after the election.
>
> 16. Can the voter sue the greeter, or anyone, because s/he was denied their right
> to vote?
>
>> For legal advice please contact your county or commonwealth attorney.
>
> . . .
>
> 18. What if an officer decides the whole thing is too confrontational and simply
> lets people vote without signing the *oath?*
>
>> Officers of Election have a sworn duty to uphold the law and must carry
>> out their responsibilities as instructed by the electoral board.

(Cortés Decl. ¶ 6, Ex. A-1 (emphases added).)

During this Court's Preliminary Injunction hearing, Commissioner Cortés testified that

the response to FAQ 15 regarding provisional votes was given in error. Cortés said that, during

the SBE's January 8, 2016 meeting, the SBE voted to provide provisional ballots in order to

comply with the Help America Vote Act.[11] Commissioner Cortés stated that collecting

---

[11] 52 U.S.C. § 21082(a) allows a voter to cast a provisional ballot when he or she claims eligibility to vote, but "an election official asserts that the individual is not eligible to vote." 52

provisional ballots did not mean that votes on provisional ballots would be counted. He testified that the SBE planned to send subsequent guidance to local election officials. Also, Commissioner Cortés said that the SBE would consider the procedures for the opportunity to cure at its February 2, 2016 meeting.

Finally, consistent with statements made during the December 16 SBE meeting, Commissioner Cortés confirmed that all Statements and provisional ballots would be considered "election materials" that would be sent to the clerk of court for each county and city in Virginia to be placed under seal for two years. Va. Code § 24.2-668(A). These materials are exempted from disclosure by the Virginia Freedom of Information Act.[12] Lists of voters and the primary and general elections in which they voted are available, but they may only be released to particular people or entities, including political parties, and only for specific purposes. Va. Code § 24.2-406(A). Persons violating § 24.2-406 face "felony penalties." Va. Code § 24.2-407 (citing id. § 24.2-1016).

On January 4, 2016, counsel for Plaintiffs filed a demand letter with the SBE, arguing that the Statement violated the Voting Rights Act, the Equal Protection Clause, the First Amendment, and Virginia Code § 24.2-545(A). (Defs.' Resp. Ex. 4, ECF No. 14-4.) After receiving no response, on January 6, 2016, Plaintiffs filed this suit. Plaintiffs, three African-

---

U.S.C. § 21082(a) (formerly codified at 42 U.S.C. § 15482). Sections 21082(a)(1)–(5) establish the procedures to examine provisional ballots for validity.

[12] *See* Va. Code § 2.2-3703 (excluding "[p]ublic access to voter registration and election records" under the Virginia Freedom of Information Act). The United States Freedom of Information Act also does not apply to Virginia's election materials. *See* 5 U.S.C. § 552(a) (outlining when an agency must make information available to the public); *id.* § 551 (defining agency to include "each authority of the Government of the United States" and not including any state agency).

American Virginia voters, assert that they wish to vote in the Republican primary. (Verified Compl. 2.) However, none of them is willing to sign the Statement. (*Id.*)

### 3. Plaintiffs' Evidence

The Plaintiffs offered just one witness in support of their claims: Plaintiff Dr. Stephen A. Parson. Dr. Parson founded the Richmond Christian Center (the "RCC") and served as its leader for 33 years. The RCC served an inner city community from its Cowardin Avenue headquarters in southside Richmond, Virginia. The RCC, Dr. Parson testified, was a church with a 99% African-American congregation. Dr. Parson has engaged in significant community service. He started the Community Development Corporation that sponsored redevelopment by building homes in economically disadvantaged parts of the city. Through the church, he also participated in drug rehabilitation and anti-drug programs, as well as micro loan programs to encourage development.

Dr. Parson did not testify to any RCC programs aimed at voters. He was not offered as, nor could he be deemed, an expert on voting, voting patterns, or voter behavior. Dr. Parson testified that he encouraged his community to vote for the candidate, not the party. Dr. Parson candidly admitted that, despite his intention to vote in this primary, he did not recall voting in any previous primary elections. He did not know that, when a citizen arrives to vote in a Virginia primary, he or she must ask for a particular party's ballot in order to cast a vote. While he did know that whether someone voted was public, he did not know how voter rolls were subject to public disclosure.

Although he attested to a long affiliation with his largely African-American church membership, Dr. Parson testified that he never knew how any specific individual within his RCC community would vote because such information was private. He does not ask. He stated that

he could not name a single person in his congregation who has said he or she wanted to vote, but would not, because of the Statement. Dr. Parson testified that he knew of only three individuals who wanted to vote, but would not, based on the required signature: himself and the other two named plaintiffs.

Dr. Parson nonetheless sought to offer testimony about the effect of the Statement on African-American voters, especially those in his RCC community. While Dr. Parson likely had valuable anecdotal testimony, he lacked an evidentiary basis to offer testimony as to African-American voting patterns generally or voter reaction to the challenged Statement here. Likewise, his Verified Complaint[13] contains sweeping allegations about historical discrimination African-Americans have experienced when voting in Virginia. Plaintiffs, however, failed to offer an evidentiary basis as to any current discriminatory practices, and the Court is hamstrung against giving Plaintiffs' evidence weight as proffered. The Court simply cannot find that 93% of African-American voters lean toward the Democratic Party based on Dr. Parson's testimony that he read this statistic in the newspaper.

### B.   Procedural History

On January 6, 2016, Plaintiffs filed their Verified Complaint. (ECF No. 1.) They simultaneously filed the Motion for Preliminary Injunction.[14] (ECF No. 3.) On January 8, 2016, the Clerk's Office received summonses from Plaintiffs and swiftly issued them. (ECF No. 5.) Late on January 8, 2016, Defendants, by counsel, appeared in the action. (ECF Nos. 9, 10.)

---

[13] The Court may consider a verified complaint as the equivalent of an affidavit but need not accept conclusions not based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (examining a verified complaint in the context of a motion for summary judgment).

[14] Plaintiffs also filed a Motion for a Temporary Restraining Order, which the Court denied as moot during the January 13, 2016 hearing. (ECF No. 27.)

Defendants also filed a motion to join the Republican Party of Virginia (the "RPV") as a necessary party. (ECF No. 7.) On Monday, January 11, 2016, the Court granted the motion and ordered the joinder of the RPV. (ECF No. 11.)[15]

That same day, Defendants filed their response in opposition to the Motion for Preliminary Injunction. (ECF No. 14.) On January 12, 2016, Plaintiffs filed their reply in support. (ECF No. 17.) The RPV did not file a response and later stated that it would join the SBE's filings. On January 13, 2016, the Court held a hearing, at which Plaintiffs and all Defendants presented their arguments. The Court allowed the parties to submit supplemental memoranda to further address any new issues that arose at the hearing. Following the hearing, on January 14, 2016, due to the highly time-sensitive nature of the proceedings, the Court issued an Order denying the Motion for Preliminary Injunction.[16] Late on that same day, both this Court and the United States Court of Appeals for the Fourth Circuit denied motions for an emergency injunction pending appeal of that Order. This Memorandum Opinion memorializes the Court's January 14, 2016 Order denying the Motion for Preliminary Injunction and expounds upon its reasoning.

## II.  Standard of Review

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012) ("*Perry II*") (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Such remedy is "never awarded as of right." *Winter*, 555 U.S. at 24. "[G]ranting a

---

[15] The Court also ordered the parties to file positions on the joinder of the SBE. (*Id.*) Neither party sought joinder of the SBE. (ECF Nos. 15, 17.)

[16] The Court's Order also held that laches did not bar Plaintiffs' claims. While Plaintiffs did not act with particular haste, waiting three weeks to file the Verified Complaint after the SBE's decision did not demonstrate a lack of diligence that would trigger a laches bar.

preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way." *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (citation omitted). Therefore, preliminary injunctions are "to be granted only sparingly." *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 590–91 (E.D. Va. 2008) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003)).

In order to be eligible for a preliminary injunction,[17] the party seeking such relief must demonstrate each of the following factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and, (4) the public interest. *Winter*, 555 U.S. at 20; *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010). Plaintiffs, as the party seeking a preliminary injunction, bear the burden[18] of establishing that each factor supports granting the injunction. *Real Truth*, 575 F.3d at 346. Each factor must be demonstrated by a "clear showing." *Winter*, 555 U.S. at 22. The failure to show any one of the relevant factors mandates denial of the preliminary injunction. *Real Truth*, 575 F.3d at 346.

---

[17] A decision to grant a preliminary injunction lies within the sound discretion of the district court. *Perry II*, 471 F. App'x at 223 (citation omitted).

[18] Courts have disputed whether an injunction seeking to prevent new voting practices from taking effect seek to protect the status quo of past procedures (thereby making them more prohibitory than mandatory) or seek to keep the status quo of a law, albeit a newly enacted one (thereby making the injunction mandatory). *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (noting that plaintiffs' motion to stop a recently passed law from taking effect sought to maintain the status quo and thus was more prohibitory than mandatory). Mandatory preliminary relief is disfavored. *Perry II*, 471 F. App'x at 223 (citing *In re Microsoft Corp.*, 333 F.3d at 525). Plaintiffs seek to stop the use of the Statement, a new step in the voting process. Such a request could be prohibitory, rather than mandatory. The Court need not undertake this analysis, however, because Plaintiffs' claims would fail in either instance.

### III.  Analysis

The circumstances of this case do not allow for a remedy as extraordinary as a preliminary injunction because Plaintiffs provide no evidentiary support for their claims showing a likelihood of success on the merits.  Accordingly, and for the reasons stated below, the Court will deny the Motion for Preliminary Injunction.

### A.  Likelihood of Success on the Merits

Plaintiffs do not articulate with clarity which constitutional rights they believe are infringed.  In their Verified Complaint, they appear to bring counts for their right to free speech and the right to equal protection.  Later, in their memoranda in support of the Motion for Preliminary Injunction, they also cite their right to vote and their right to association.  The Court addresses the gravamen of Plaintiffs' claims:[19]  Plaintiffs' fundamental rights to vote and to associate, or perhaps not associate, with a political party.

### 1.  First and Fourteenth Amendments Rights

In assessing Plaintiffs' First and Fourteenth Amendment challenges in this voting rights case, the Court must utilize the framework articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992.[20]  The *Anderson/Burdick* framework "holds

---

[19] Plaintiffs seem to allege a violation of their equal protection rights because of the discriminatory impact that they *anticipate* African-American voters will experience as a result of the Statement.  Notwithstanding the speculative nature of this claim, the Supreme Court has repeatedly held that proof of a discriminatory impact is not sufficient by itself to prove an equal protection violation.  *See, e.g., Mobile v. Bolden*, 446 U.S. 55, 67 (1980) ("[O]nly if there is a purposeful discrimination can there be a violation of the Equal Protection Clause . . . . [T]his principle applies to claims of racial discrimination affecting voting just as it does to other claims of racial discrimination.").

[20] The *Anderson/Burdick* test applies to all of Plaintiffs' constitutional claims.  The Supreme Court has confirmed the test's application in a broad range of voting rights contexts.  *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring) ("To

13

that the State's asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed on the party's rights." *Sarvis v. Judd*, 80 F. Supp. 3d 692, 698 (E.D. Va. 2015) (citation omitted). To apply the *Anderson/Burdick* test, the Court is guided by the following procedure:

> [The Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789.

"'Depend[ing] upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights,' the regulation will either face strict scrutiny review or a more deferential standard of review." *Sarvis*, 80 F. Supp. 3d at 698 (quoting *Burdick*, 504 U.S. at 434) (alteration in original). "When the plaintiffs' 'rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance.'" *Id.* On the other hand, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*

---

evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick* . . . .").

Additionally, although the Supreme Court has not applied the *Anderson/Burdick* test to a stand-alone equal protection claim, circuit courts have recognized its vitality in evaluating all challenges to voting restrictions. *See, e.g., Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015) ("[T]he *Anderson–Burdick* test serves as 'a single standard for evaluating challenges to voting restrictions.'"); *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006) ("[W]e conclude that *Anderson* sets out the proper method for balancing both associational and equal protection concerns and the burdens that the challenged law creates on these protections as weighed against the proffered state interests.").

(quoting *Burdick*, 504 U.S. at 434).  Accordingly, "modest burdens are balanced 'against the extent to which the regulations advance the state's interests.'"  *Id.* (quoting *Pisano v. Strach*, 743 F.3d 927, 936 (4th Cir. 2014)).  At the same time, "there is a presumption that important state interests are 'generally sufficient to justify reasonable, nondiscriminatory restrictions.'"  *Id.* (quoting *Wood v. Meadows*, 207 F.3d 708, 715–17 (4th Cir. 2000)).[21]

### a.  <u>Burdens on Plaintiffs</u>

The Court first "consider[s] the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the [Plaintiffs seek] to vindicate." *Anderson*, 460 U.S. at 789.  Plaintiffs raise two potentially implicated rights at stake:  their right to vote and their right to association.  The Court examines each in turn, then evaluates the injuries asserted by the Plaintiffs.

A voter's right to vote "is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964).  The right to vote in a general election is well

---

[21] Justice O'Connor summarized the rationale for this approach in *Clingman*:

> This regime reflects the limited but important role of courts in reviewing electoral regulation. Although the State has a legitimate—and indeed critical—role to play in regulating elections, it must be recognized that it is not a wholly independent or neutral arbiter. Rather, the State is itself controlled by the political party or parties in power, which presumably have an incentive to shape the rules of the electoral game to their own benefit. Recognition of that basic reality need not render suspect most electoral regulations. Where the State imposes only reasonable and genuinely neutral restrictions on associational rights, there is no threat to the integrity of the electoral process and no apparent reason for judicial intervention. As such restrictions become more severe, however, and particularly where they have discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition. In such cases, applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions.

544 U.S. at 603 (O'Connor, J., concurring).

established.[22] Likewise, the "freedom to associate with others for the common advancement of political beliefs and ideas is . . . protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973); *accord NAACP v. Alabama*, 357 U.S. 449, 460 (1958). "The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Kusper*, 414 U.S. at 57. And concurrent with the freedom to associate is the freedom *not* to associate. *Clingman*, 544 U.S. at 599–600; *Jones*, 530 U.S. at 574. The Supreme Court has neither articulated, nor repudiated, a voter's right *not* to associate with a political party. However, the Supreme Court has expressed that voters' rights not to associate with a party cannot trump, or even equal, a political party's right not to associate with some voters: "nonparty members' keen desire to participate in selection of the party's nominee . . . is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications." *Jones v. City of Philadelphia Voter Registration*, 498 F. App'x 143, 144–45 (3d Cir. 2012) (citing *Jones*, 530 U.S. at 583–84). Still, this does not abrogate a voter's right to associate altogether. *Jones*, 530 U.S. at 601 (Stevens, J., dissenting) ("I would . . . give some weight to the First Amendment associational interests of non-members of a party seeking to participate in the primary process . . . .").

Having established the root of Plaintiffs' asserted rights, the Court evaluates what Plaintiffs allege are the burdens or restrictions on those rights. Plaintiffs allege three burdens to their constitutional rights to vote and associate: (1) the public nature of the Statement and the

---

[22] That said, the Supreme Court seems to question whether the right to vote in a primary is *as* fundamental as exercising that right in a general election. *See Jones*, 530 U.S. at 573 n.5 ("*Selecting* a candidate [to be nominated] is quite different from voting for the candidate of one's choice [who could take office].") (emphasis added); *Jones v. Alabama*, No. Civ. A. 00-0442, 2001 WL 303533, at *3 (S.D. Ala. Mar. 6, 2001). Of course, the Supreme Court has not held that *no* fundamental right to vote in a primary exists. *See Jones*, 530 U.S. at 601 (Stevens, J., dissenting) ("I would also give some weight . . . to the fundamental right of such nonmembers to cast a meaningful vote for the candidate of their choice.").

unpopularity of declaring oneself a Republican will cause them to experience backlash in their communities; (2) long lines will deter those in the minority community; and, (3) the Statement will confuse voters.[23] Plaintiffs' contentions do not constitute significant burdens, for three reasons.

The Court first addresses the backlash in the community and finds that Plaintiffs put forth no evidence showing burdens. Plaintiffs' contention fails for three reasons. First, Dr. Parson cannot establish that a voter's signing of the Statement is either public or enforceable. The evidence demonstrates that the signed Statements will be considered "election materials" not subject to state or federal FOIA release. Thus, no evidence exists that the public could access any specific Statement after the March 1 primary. Further, the pledge is "legally unenforceable." *Ray v. Blair*, 343 U.S. 214, 230 (1952); *Alabama*, 2001 WL 303533, at *3 (finding a voter pledge to support a political party's nominees in the general election to be a "minimal imposition because it was unenforceable by external compulsion"). Counsel for the RPV confirmed that the Statement had no teeth when he argued that it did not bind the voter to any future obligation, meaning a voter could have a change of heart the moment after walking out of the voting booth. A private, unenforceable pledge does not pose a severe burden.

Second, Dr. Parson's testimony established that, while he *believed* his community would experience backlash, he could identify no *other* person who had specifically experienced threats

---

[23] The Court has difficulty discerning where Plaintiffs' vague assertion that this Statement amounts to a literacy test falls. Plaintiffs object that only Fairfax County will offer these documents in Spanish. Without more, Plaintiffs do not allege conduct that violates constitutional principles. By law, volunteer readers and translators are made available to voters who need assistance. Va. Code § 24.2-649(B), (C).

for openly associating with the Republican Party.[24]   While he believed unnamed persons made negative phone calls to his church after his endorsement of Mr. Trump, Dr. Parson had no personal knowledge of the content of the calls.   Certainly, he offered no admissible evidence about backlash to others for willingness to sign the Statement.   Accordingly, the alleged public nature of the Statement, and the resulting backlash, cannot constitute a severe burden on the right to vote or associate.

Plaintiffs put forth virtually no evidence as to their second concern:  that long lines will occur; that such lines will deter voters; or, that the lines will disproportionately deter minority voters.   Some evidence did suggest that lines might occur, but this came from Defendants. Comments during the December 16, 2015 SBE meeting, including statements from registrars, established that a 2000 "voter statement/pledge" had caused lines in 2000.   (Defs.' Resp. Ex. 2, at 9.)   The SBE heard from a representative of the RPV that the turnout for the 2000 primary had been unusually large and that such turnout need not predict events in this primary.   (*Id.*)   The SBE then approved the Statement.

Dr. Parson offered no evidence of the deterrent effect of long lines.   First, he could not recall having ever voted in a primary himself and agreed that he had no experience with such elections.   Second, he testified that he had not spoken with any other person who had experienced long lines at a polling place.   Relatedly, he could not name one person who had been deterred by long lines at a polling place.   Most importantly for the Motion for Preliminary Injunction, with the exception of his two co-plaintiffs, he did not identify any voter who would

---

[24] Dr. Parson testified that he has publicly affiliated himself with Donald Trump, one of the candidates seeking the Republican Party nomination for President of the United States.   Dr. Parson testified to significant backlash from his longstanding association with conservative values.   No admissible evidence exists that, beyond Dr. Parson's anecdotal hearsay, public affiliation with the RPV actually caused any repercussions on anyone but himself.

personally be deterred from voting based on the prospect of long lines. Thus, Plaintiffs' claims of long lines are entirely speculative, and under *Anderson/Burdick*, they do not constitute a severe burden.

As to the third restriction on voting alleged by Plaintiffs, the Court finds persuasive some of Plaintiffs' claims as to voter confusion and the need for an orderly electoral process. The SBE's own exhibits establish that voter confusion resulted from a 2000 pledge. During the preliminary injunction hearing, the SBE did not offer cogent explanations for the differences between the absentee ballot enclosures and the statements to accompany in-person voting. The SBE never explained why what it describes as a mechanistic "approval" of the RPV's proposal included adding language about voters not being allowed to vote if they did not sign.

While this statement likely comports with Supreme Court precedent, the process the SBE undertook remains clouded. Indeed, given that provisional ballots were just approved on January 8, the process to handle those ballots remained entirely undeveloped at the time of this Court's preliminary injunction hearing. The Court cannot credit Dr. Parson's testimony that African-American voters will be confused by the Statement, but some of the SBE's own FAQs suggest that electors anticipate difficulty with implementing the Statement at the polls. The in-person voting procedure remains in flux to a noteworthy degree. Plaintiffs thus raise matters of significant concern as to the SBE's duties to avoid voter confusion and to preserve the integrity of, and order in, the electoral process.

However, Plaintiffs' limited evidence has, at best, established only that some voter confusion might occur as a result of the Statement. The Court cannot conclude that such a burden is "severe." *Sarvis*, 80 F. Supp. 3d at 698. Although Plaintiffs' additional claims of burden do not necessarily fail, they lack support at this stage of the proceedings. Accordingly,

19

because Plaintiffs do not establish "severe" burdens, the Court must next determine whether the SBE has established "important" interests in their use of the Statement. *Id.*

### b.   Virginia's Interests

The Court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789. The Supreme Court has repeatedly recognized a state's "major role" in "structuring and monitoring the election process, including primaries." *Jones*, 530 U.S. at 572. "But, in exercising their powers of supervision over elections and in setting qualifications for voters, the [s]tates may not infringe upon basic constitutional protections." *Kusper*, 414 U.S. at 57. Thus, the state's "power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote." *Tashjian*, 479 U.S. at 217. Here, at least two state interests support justification of the Statement: first, the Commonwealth's protection of the RPV's own constitutional rights, and second, the state's interest in the order and integrity of the electoral process. *But see Clingman*, 544 U.S. at 616 (Stevens, J., dissenting).

The SBE's overarching argument rests on its mandate to support the electoral process, which includes protection of the RPV's constitutional right to association.[25]  No dispute exists that the RPV's "determination of the boundaries of its own association . . . is protected by the Constitution." *Tashjian*, 479 U.S. at 224. Unless the RPV's proposal violates the law, the SBE "may not constitutionally substitute its own judgment for that of the [RPV]" and is prohibited from "interfer[ing] on the ground that they view a particular expression as unwise or irrational." *La Follette*, 450 U.S. at 123–24; *Tashjian*, 479 U.S. at 224. Indeed, not long ago, the Fourth Circuit admonished the SBE that it must take care not to tread on a political party's rights to

---

[25] Of course, the SBE cannot allow the RPV to implement requirements that impose an unconstitutional burden on potential voters.

association, ruling that the SBE's implementation of Virginia's open primary statute for General Assembly offices was unconstitutional because it applied to a political party's local committee's right to hold a closed primary. *Miller*, 503 F.3d at 371.

Notably, courts value a party's rights to associate, and not to associate, especially highly at the presidential nominating level. "The State [as opposed to the political party] has a less important interest in regulating Presidential elections than statewide or local elections." *Anderson*, 460 U.S. at 795; *see Wood*, 207 F.3d at 711 n.1 (emphasizing the significance of the distinction between primaries for national office as opposed to statewide and local offices). Virginia statutory law also reflects this difference. For example, Virginia explicitly allows political parties to set requirements for presidential primary elections but does not expressly afford a concurrent right in other elections. *Compare* Va. Code § 24.2-545(A) (providing for a presidential primary held "subject to requirements determined by the political party for participation in its presidential primary"), *with* Va. Code § 24.2-509 (dictating primary elections for nominees to the United States Senate or any statewide office without including the reference to the political parties' ability to establish constraints). Consistent with Supreme Court precedent and Virginia statutory law, the SBE has an especially strong interest in protecting the RPV's rights to associate and not associate in the March 1, 2016 presidential primary. Accordingly, the SBE clearly has a legitimate interest in adhering to Supreme Court dictates to recognize the RPV's rights of association.

Also, the Supreme Court time and again has cited states' major interests in the "integrity of the electoral process." *Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973). Specifically, courts often cite "raiding," the process by which "voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other

21

party's primary," as a particular threat to the need for order and reliability.  *Id.* at 760; *see*

*Clingman*, 544 U.S. at 596; *Jones*, 530 U.S. at 572, 575; *Kusper*, 414 U.S. at 59.  While Virginia

voters certainly may, and likely do, vote for candidates of parties that they do not wholly

support, the Supreme Court recognizes that the Commonwealth retains a strong interest in

preventing those voters who seek to cast a disingenuous vote with strategic intent.  Accordingly,

the SBE has at least legitimate interests at stake.

**c.      Balancing**

With this limited record, the Court finds that the SBE has articulated important state

interests given its major role in structuring and monitoring the election process that justify any

deterrent effect the Statement might impose on Plaintiffs.  *See Ray*, 343 U.S. at 230.  The Court

finds, for purposes of this preliminary injunction, that Plaintiffs fail to establish that the

Commonwealth has implemented anything but neutral and reasonable restrictions on

associational and voting rights.  Because the Statement does not impose a severe burden, and

may reflect the RPV's constitutional rights, the SBE's important regulatory interests justify these

reasonable, non-discriminatory restrictions on the right to vote in the Republican presidential

primary.  *Clingman*, 544 U.S. at 587.

**2.      Voting Rights Act**

The Court turns to Plaintiffs' statutory claims.  The evaluations below do not involve the

*Anderson/Burdick* analysis.

**a.      Section 2**

Section 2 of the Voting Rights Act prohibits any "voting qualification or prerequisite to

voting" or any state-imposed "standard, practice, or procedure . . . imposed or applied . . . in a

manner which results in a denial or abridgement of the right of any citizen of the United States to

22

vote on account of race or color." 52 U.S.C. § 10301(a) (formerly codified at 42 U.S.C. § 1973(a)). In such a claim, the Court must examine the "totality of the circumstances" to determine whether "the political processes leading to nomination or election" are "equally open to participation" by members of a protected class. *Id.* § 10301(b). To determine whether processes are "equally open to participation," the Court looks to whether the members of the protected class "have less opportunity than other members of the electorate to participate in the political process." *Id.*

The Court is mindful that Virginia bears the scars of an indefensible history of discrimination against particular voters, especially African-Americans. *Neal v. Coleburn*, 689 F. Supp. 1426, 1428 (E.D. Va. 1988) (detailing decades of discriminatory electoral practices sanctioned by the Commonwealth); *see Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619–20 (2013). The Court examines the evidence with that backdrop as part of the totality of the circumstances.

"The essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Section 2 effectuates a "'permanent, nationwide ban on racial discrimination' because 'any racial discrimination in voting is too much." *League of Women Voters*, 769 F.3d at 238. Due to the import in ensuring equality in our representative democracy, a party needs not demonstrate intent; Section 2 violations can "be established by proof of discriminatory results alone." *League of Women Voters*, 769 F.3d at 238 (citing *Chisom v. Roemer*, 501 U.S. 380, 404 (1991)).

The record before the Court cannot show that Plaintiffs are likely to succeed on the merits of their claim under Section 2 of the Voting Rights Act. The Court must evaluate whether

"the political processes leading to nomination or election" are "equally open to participation" by members of a protected class. *Id.* § 10301(b)

Plaintiffs place before the Court virtually no evidence that the Statement results in any actual discrimination against a protected class. Instead, Plaintiffs broadly contend that longer lines, voter confusion, and other inconveniences will result from the administrative burden of enforcement of the Statement, and that these difficulties will discriminately impact people of color. But even given Virginia's inexcusable history of race-based voting restrictions, speculation of such burdens cannot support a finding by this Court that they will or have actually occurred. Plaintiffs have not introduced specific evidence of any eligible voter (other than Plaintiffs) who is discriminated against by the Statement. *See Crawford*, 553 U.S. at 187, 200–01. Accordingly, on the basis of the present record, Plaintiffs cannot show a likelihood of success on the merits of their claim under Section 2 of the Voting Rights Act.

### b.   Section 11

52 U.S.C. § 10307(b), commonly known as Section 11(b) of the Voting Rights Act, prohibits actions that, *inter alia*, "intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b) (formerly codified at 42 U.S.C. § 1973i). Limited precedent on Section 11(b) indicates that, in order to succeed on such a claim, a plaintiff must show both an act of intimidation or attempt to intimidate, and that the act was done with the specific intent to intimidate or attempt to intimidate. *See Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985) (noting that even assuming that plaintiffs' evidence showed that voters were intimidated when officials searched voting records, plaintiffs could not succeed for failure to show that the officials intended to intimidate) (citing *United States v. McLeod*, 385 F.2d 734, 740–41 (5th Cir. 1967)).

Plaintiffs are not likely to succeed on the merits of their claim of voter intimidation under Section 11(b) of the Voting Rights Act given the evidence before the Court. Plaintiffs must show that the SBE engaged in intimidation, threats, coercion, or attempted acts of intimidation, threats, or coercion against a person voting or attempting to vote. *See Olagues*, 770 F.2d at 804 (applying predecessor statute); *McLeod*, 385 F.2d at 740–41 (same). Plaintiffs cite as a "threat" the Statement's citation of Virginia Code § 24.2-545(A) and its sentence stating that "[a]ny voter refusing to sign the statement form cannot vote in this Republican Party nominating process." (Pls. Br. 8.) Despite some citizens' disquietude with a new process, Plaintiffs have not demonstrated that the Statement is in any way unlawful. The incidents experienced by Dr. Parson and his church as a result of his voluntary public association with one Republican candidate cannot support a claim of intimidation to an entire community emanating from the Statement.

Second, Plaintiffs must show that that the intimidating act was done with the specific intent to intimidate, threaten, coerce, or attempt to do so to prevent a person from voting or attempting to vote. *See Olagues*, 770 F.2d at 804 (applying predecessor statute); *McLeod*, 385 F.2d at 740–41 (same). Plaintiffs place no evidence before this Court showing that the SBE has any intent to prevent their vote. To the extent Plaintiffs contend the RPV seeks to exclude Democrats, Plaintiffs have not offered admissible evidence as to how the exclusion of Democrats flows from racially based animus. Accordingly, because Plaintiffs can show neither that the SBE undertook any acts of intimidation nor that they intended to do so, Plaintiffs cannot show they have a likelihood of success on their claim under Section 11(b) of the Voting Rights Act.

### 3.    Virginia Code Section 24.2-545

The Court first notes that neither party offers substantive analysis regarding the validity

of this Court's supplemental or pendant jurisdiction over this state law claim. Both parties

simply address the merits. Regardless of any jurisdictional issue, this Court expresses concern

about whether the state law includes a private right of action Plaintiffs can invoke, meaning that

the Plaintiffs cannot prevail.

Virginia Code § 24.2-545(A) provides that, should a party elect to have a primary as its

presidential nominating process, "each registered voter of the Commonwealth shall be given an

opportunity to participate in the presidential primary of the political party . . . , subject to

requirements determined by the political party for participation in its presidential primary." Va.

Code § 24.2-545(A). The code mandates that these requirements "be determined at least 90 days

prior to the primary date and certified to, and approved by, the [SBE]." *Id.*; *see Perry II*, 471 F.

App'x at 221.

Plaintiffs are not likely to prevail on their claim that Defendants violated Virginia Code

§ 24.2-545(A) when the SBE did not approve the Statement until December 16, 2015. Asking

this Court to evaluate the weeds of this claim, the Plaintiffs argue that because the SBE finalized

and made public the Statement only 76 days prior to the March 1, 2016 primary, the SBE

violated the mandate that the requirements determined by the RPV be approved by the SBE 90

days prior to the primary.[26]

---

[26] Were this Court to evaluate this argument, it seems a plain reading of the statute and
established grammatical rules show that the 90-day deadline applies only to the determination of
the requirements by the RPV, not the certification and approval by the SBE. Va. Code § 24.2-
545(A) ("The requirements applicable to a party's primary shall be determined at least 90 days
prior to the primary date and certified to, and approved by, the [SBE].").
    Under the grammatical "rule of the last antecedent," according to which a limiting clause
or phrase should ordinarily be read as modifying only the noun or phrase that it immediately

Plaintiffs' argument also likely fails because they have made no demonstration that a

private right of action exists under Section 24.2-545(A), which "lack[s] explicit language

creating" a private right of action.[27] *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d

212, 229 (4th Cir. 2004). Without an express right, the Court must be careful to avoid reading an

implied right into the statute if such a right does not exist. "[F]ederal courts should be reluctant

to read private rights of action into state laws where state courts and state legislatures have not

done so." *A&E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 674 (4th Cir. 1986).

This notion is consistent with the concepts of federalism and the separation of powers inherent in

our system of government. "Without clear and specific evidence of legislative intent, the

creation of a private right of action by a federal court abrogates both the prerogatives of the

political branches and the obvious authority of states to sculpt the content of state law." *Id.*

---

follows, the phrase "at least 90 days prior to the primary date" modifies only when the
requirements "shall be determined," not when the requirements must be "certified to, and
approved by, the [SBE]." *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); *accord City of
Lynchburg v. English Constr. Co.*, 675 S.E.2d 197, 201 (Va. 2009) ("[R]eferential and qualifying
words and phrases, where no contrary intention appears, refer solely to the last antecedent.").

[27] In Plaintiffs' supplemental brief, for the first time, they cite to Virginia Code § 2.2-
4026, which provides a process for a *state* administrative appeal:

> Any person affected by and claiming the unlawfulness of any regulation or party
> aggrieved by and claiming unlawfulness of a case decision . . . shall have a right
> to the direct review thereof by an appropriate and timely court action against the
> agency or its officers or agents in the manner provided by the Rules of [the]
> Supreme Court of Virginia.

Va. Code § 2.2-4026(A). Plaintiffs do not claim the unlawfulness of any regulation. Further, the
SBE's decision to require the Statement as a precondition to voting in the Republican
presidential primary may not constitute a "case decision." *See Giannoukos v. Va. Bd. of Med.*,
607 S.E.2d 136, 138 (Va. App. 2005) (holding that a "case decision" contemplated a
determination that "a named party is or may be in violation" of laws or regulations in effect at
the time, not a "determination addressing only the agency's legal duties").

Plaintiffs also do not point to authority discerning an implied private right of action in Section 24.2-545(A).

**B.    Equitable Factors[28]**

The Court now turns to the equitable factors in play regarding the Preliminary Injunction: the likelihood of irreparable harm to the Plaintiffs; the balance of the equities among the parties; and, the public interest.  While Plaintiffs have legitimate concerns, these three factors ultimately lean toward denial of the relief sought.

The Court has already noted that it cannot find that the Plaintiffs are likely to succeed on the merits of their claims because the burdens they have shown cannot outweigh the legitimate interests advanced by the SBE.  However, the Court sees some restriction on Plaintiffs' constitutional rights.  In the preliminary injunction context, any burden on important constitutional rights can constitute harm.  "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters*, 769 F.3d at 247.  The Plaintiffs have shown some likelihood of harm.  Once the March 1, 2016 primary occurs—indeed, once absentee ballots have been sent by January 16, 2016—"there can be no do-over and no redress." *Id.*

However, applications for a preliminary injunction affecting ballot access have been "consistently denied when they threaten to disrupt an orderly election." *Perry II*, 471 F. App'x at 227 (citation omitted).  Indeed, the Fourth Circuit has characterized the disapproval of eleventh hour changes to an otherwise orderly election process as "not just caution lights to lower federal courts; they are sirens." *Id.* at 228.  The Court should caution against ordering the

---

[28] Because the Court discerns no likelihood of success on the merits, it need not examine the other three preliminary injunction factors. *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 702 (E.D. Va. 2000) ("Unless the plaintiff proves irreparable injury, the analysis never proceeds further."). However, the Court comments on each factor to establish a full and clear record.

SBE to revert to "election procedures for which the [SBE] maintains it has not, and is not, prepared." *League of Women Voters*, 769 F.3d at 250 (Motz, J., dissenting).

In this case, the SBE could be substantially harmed by the granting of an injunction. Some ballots were already mailed by the time of the hearing on the Preliminary Injunction. The absentee ballot enclosures seem to contain less flatly prohibitive language, and they affect a subset of voters. The SBE must meet the dictates of the Overseas Citizens Absentee Voting Act and timely mail all absentee ballots. An injunction immediately at this deadline would significantly impair the ability of localities to comply with federal law.

Finally, Plaintiffs' decision to sit on their hands for three weeks affects their rights to cry foul now. While laches doesn't bar Plaintiffs' claims, equity does weigh against imposing emergency deadlines when an earlier complaint could have made redress less drastic. Further, an injunction following the mailing would create administrative burdens on the SBE, who would then have to determine how to notify the absentee voters how to handle the Statements they received. Accordingly, although the Plaintiffs have identified the possibility of future harm, any encumbrances on the orderly process of the March 1, 2016 primary election that an injunction would cause counsel denial of the Preliminary Injunction.

For related reasons, the public interest weighs in favor of denial of the Preliminary Injunction, despite some findings this Court has made. Plaintiffs raise matters of significant concern as to the SBE's duties to avoid voter confusion and to preserve the integrity of, and order in, the electoral process. The in-person voting procedure remains in flux. During the January 13, 2016 hearing, the SBE disclosed for the first time that, as of January 8, 2016, the SBE changed the in-person voting procedure to include the use of a provisional ballot—one that likely would not be counted. The SBE stated that it will give corrected instructions to voting

officials. The record portends some disorder at the polls surrounding the use and validity of provisional ballots and the enforceability of the Statement. But such evidence remains speculative at best. Accordingly, the evidence before the Court cannot establish the need to grant the extraordinary remedy of a Preliminary Injunction.

### IV.  Conclusion

"In sum, on the basis of the record that has been made in this litigation, [the Court] cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters." *Crawford*, 553 U.S. at 202. In an atmosphere of party divisions, attempts to circumscribe voting rights must be carefully reviewed under the law. Notwithstanding the administrative cost and futility of an unenforceable statement of affiliation, this Court cannot "constitutionally substitute its own judgment for that of the [RPV and the SBE]." *La Follette*, 450 U.S. at 123–24; *Tashjian*, 479 U.S. at 224. For the reasons stated above, and in accordance with this Court's Order entered January 14, 2016 (ECF No. 33),[29] this Court denies Plaintiffs' Motion for Preliminary Injunction. (ECF No. 3.)

/s/

M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: _1/15/16_

---

[29] In its January 14, 2016 Order, the Court directed the parties to contact the Court for further steps within 48 hours of this Memorandum Opinion's issuance. To clarify, this instruction contemplated two *business* days and did not include weekends or legal holidays as defined in Federal Rule of Civil Procedure 6(a)(6).